# ASSET PURCHASE AGREEMENT

AGREEMENT made as of this 18th day of October, 2001, between **The 357 CORP.**, a corporation organized under the laws of the Commonwealth of Massachusetts with a usual place of business in Westwood, Massachusetts (the "Seller") and **THE WEBSTER CORPORATION**, a Massachusetts corporation ("Purchaser").

## WITNESSETH:

WHEREAS, subject to the terms and conditions hereof, Seller desires to sell and Purchaser desires to purchase certain assets of Seller related to Seller's driver leasing business (the "Business"), which assets are listed on Exhibit A hereto (the "Acquired Assets"), and to assume certain obligations of Seller under a certain Driver Service Agreement described on Exhibit B hereto (the "Stop & Shop Contract"); and

WHEREAS, Seller and Purchaser want to reduce their Agreement to writing with respect to the sale of the Acquired Assets and the assignment and assumption of the Stop & Shop Contract;

NOW, THEREFORE, in consideration of the above premises and mutual covenants, conditions and agreements set forth herein, Seller and Purchaser hereby agree as follows:

## SECTION I.  PURCHASE AND SALE OF ASSETS

1.1  **Sale of Assets.** Subject to the provisions of this Agreement, Seller shall sell and Purchaser shall purchase the Acquired Assets and Seller shall assign all of its right, title and interest in the Stop & Shop Contract to Purchaser on the Closing Date, as hereinafter defined. The Acquired Assets shall not include, and the Purchaser shall have no right to any accounts receivable of Seller.

1.2  **Assumptions of Liabilities.** Seller shall retain and be responsible for all accounts payable and all other obligations, debts and liabilities of whatever kind or nature in connection with the Acquired Assets and in connection with the Stop & Shop Contract arising prior to the Closing, including, without limitation, all employee wages and all past taxes imposed or levied on Seller (collectively "Liabilities"), existing and accrued as of the Closing Date. Purchaser will not assume or agree to perform, pay or discharge or in any way become liable for any of Seller's Liabilities except as set forth in this Agreement. Purchaser shall assume all of the Seller's obligations under the Stop & Shop Contract that become due after the Closing Date including, but not limited to, all employee wages and taxes and withholding amounts therefrom. Purchaser agrees as of the Closing Date to lease from Seller all of those drivers listed on Exhibit C hereto, and on January 1, 2002 all of such employees shall become employees of Purchaser.

1.3  **Purchase Price and Payment.** In consideration of the sale by Seller to Purchaser of the Acquired Assets and its right, title and interest in the Stop & Shop Contract, Purchaser

shall pay to Seller the purchase price of (the "Purchase Price") as follows:

    (a)    Upon the date of the execution of this Agreement, the Purchaser shall pay to Seller's attorneys, Davis, Malm & D'Agostine, P.C. ("Escrow Agent") a non-refundable deposit of Ten Thousand Dollars ($10,000.00). At Closing, this deposit shall be applied towards the balance of the Purchase Price due from Purchaser to Seller hereunder.

    (b)    The balance of the Purchase Price 240,000 shall be payable over a period of three years. The payment of such amount shall be contingent upon the continuing receipt by Purchaser of service fees from The Stop & Shop Company or any of its affiliates, successors or assigns (collectively "Stop & Shop") under the Stop & Shop Contract or any other contract with Stop & Shop. Purchaser shall pay Seller monthly an amount equal to 21.0365% of all service or other fees received by Purchaser or any affiliated entity from Stop & Shop if, as and when received, but such payment shall not exceed 240,000 for the three year period.

    1.4    TransLease Group Consulting Agreement. The TransLease Group, Inc. ("TransLease") is an affiliate of the Seller, which has been intimately involved with the Business. At the time of the Closing, TransLease shall continue to provide consulting and support services to Purchaser, when requested by Purchaser (subject to the availability of TransLease employees), for a period of three years for payments equal to 12.62% of all service or other fees received by Purchaser or any of its affiliates, successors or assigns from Stop & Shop under the Stop & Shop Contract or any other contract with Stop & Shop during such three year period, but such total payments for such three year period shall not exceed $150,000. Such payments shall be made to TransLease monthly if and when payments are received by Purchaser from Stop & Shop. In addition, TransLease agrees that for a period of five (5) years from the Closing Date it will not enter into the business of employee leasing anywhere within the New England states.

    1.5    Closing/Closing Date. The Closing shall take place commencing at 10:00 a.m. on October 18, 2001 ("Closing Date") at the offices of Davis, Malm & D'Agostine, P.C., 37th Floor, One Boston Place, Boston, Massachusetts, unless another date and time is mutually agreed to by Seller and Purchaser.

    1.6    Transfer of Acquired Assets. At the Closing, Seller shall deliver or cause to be delivered to Purchaser, good and sufficient instruments of transfer transferring and assigning to Purchaser all of the Acquired Assets and the Stop & Shop Contract, free and clear of all liens or encumbrances in the form attached hereto as Exhibit D. Each party shall provide the other with satisfactory evidence of its authority to execute this Agreement and all other documents executed by it in connection therewith.

    1.7    Further Assurances. From time to time after the Closing Date at the request of Purchaser, Seller shall without further consideration execute and deliver further instruments of transfer and assignment and take such other action as Purchaser may reasonably request to more

effectively transfer and assign to, and vest in, Purchaser each of the Acquired Assets and the Stop & Shop Contract.

1.8   Allocation of Purchase Price. The parties have agreed that the Purchase Price shall be allocated among the various assets being purchased in accordance with Exhibit E hereto. Such allocation has made in accordance with the provisions of Section 1060 of the Internal Revenue Code of 1986, as amended (the "Code"), and shall be binding upon Purchaser and Seller for all purposes (including financial accounting purposes, financial and regulatory reporting purposes and tax purposes) and Seller and Purchaser agree that they will not take any tax reporting position inconsistent with that designated on Exhibit E.

1.9   Collection of Accounts Receivables. Purchaser hereby covenants and agrees that from and after Closing Date, Purchaser shall use commercially reasonable efforts to assist the Seller in the collection of Seller's accounts receivable relating to the Business prior to the Closing.

## SECTION II.   REPRESENTATIONS AND WARRANTIES OF SELLER

As an inducement to Purchaser to enter into this Agreement and consummate the transactions contemplated hereby, Seller hereby represents to Purchaser the following:

2.1   Organization and Qualifications of Seller. Seller is a corporation duly organized, validly existing and in good standing under the laws of the Commonwealth of Massachusetts, with full corporate power and authority to own or lease its properties and to conduct its business in the manner and in the places where such properties are owned or leased or such business is currently conducted or proposed to be conducted.

2.2   Authority of Seller.

(a)   Seller has full right, authority and power to enter into this Agreement and each other agreement, document and instrument to be executed and delivered by Seller pursuant to this Agreement and to carry out the transactions contemplated hereby and thereby. The execution, delivery and performance by Seller of this Agreement and each such other agreement, document and instrument executed in connection with this Agreement have been duly authorized by all necessary action of Seller and no other action on the part of Seller is required in connection therewith. This Agreement and each other agreement, document and instrument executed and delivered by Seller pursuant to this Agreement constitute, or when executed and delivered will constitute, valid and binding obligations of Seller enforceable in accordance with their terms.

(b)   The Stop & Shop Contract is valid and binding in accordance with its terms and Seller has delivered a true copy of the Stop & Shop Contract to Purchaser.

2.3   Litigation. There are no actions, suits, proceedings, or orders relating to the Seller and/or the Acquired Assets which seeks to or which would prevent or adversely affect Seller's performance under this Agreement.

2.4 <u>Bankruptcy</u>. Seller is not a party to any bankruptcy and/or insolvency proceeding as of the date hereof nor will be as of the Closing Date, nor are there any voluntary or involuntary bankruptcy and/or insolvency proceedings pending or threatened against Seller.

2.5 <u>Creditors</u>. The Seller is not insolvent, nor will it be as of the Closing Date, and the Seller is not entering into this Agreement to hinder, delay or defraud creditors.

## SECTION III. REPRESENTATIONS AND WARRANTIES OF PURCHASER

3.1 <u>Organization of Purchaser</u>. Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the Commonwealth of Massachusetts, with full corporate power to own or lease its properties and to conduct its business in the manner and in the places where such properties are owned or leased or such business is conducted by it.

3.2 <u>Authority of Purchaser</u>. Purchaser has full right, authority and power to enter into this Agreement, and each other agreement, document and instrument to be executed and delivered by Purchaser pursuant to this Agreement and to carry out the transactions contemplated hereby and thereby. The execution, delivery and performance by Purchaser of this Agreement, and each such other agreement, document and instrument have been duly authorized by all necessary action of Purchaser, and no other action on the part of Purchaser is required in connection therewith. This Agreement constitutes a valid and binding obligation of Purchaser enforceable in accordance with its terms. The execution, delivery and performance by Purchaser of this Agreement and each such other agreement, document and instrument:

(a) do not and will not violate any provision of the Charter, operating agreement or by-laws of Purchaser;

(b) do not and will not violate any laws of the United States or any state or any other jurisdiction applicable to Purchaser, or require Purchaser to obtain any approval, consent or waiver of, or make any filing with, any person or entity (governmental or otherwise) that has not been made or obtained.

## SECTION IV. TERMINATION

4.1 <u>Termination</u>. This Agreement may be terminated at any time prior to the Closing:

(a) By mutual consent of Purchaser and Seller;

(b) By either Purchaser or Seller, upon written notice to the other party, if there has been a material misrepresentation, covenant or condition on the part of the other party;

(c) By reason of the failure of any condition precedent under this Agreement.

In the event of termination of this Agreement by both Purchaser and Seller, this Agreement will forthwith become void, the Deposit shall be returned to Purchaser and there will be no further liability on the part of either Purchaser or Seller hereunder. If such termination is a

4

result of a default of the Seller hereunder, the Escrow Agent shall return the entire Deposit to Purchaser with all interest thereon. Upon a default by Purchaser hereunder, Escrow Agent shall transfer the Deposit and all interest thereon to Seller. In the event of a dispute between the parties hereto, the Escrow Agent shall have the right to continue and hold all deposits until the parties' right to the deposit are finally adjudicated or agreed upon.

## SECTION V.  CONDITIONS TO PURCHASER'S OBLIGATIONS

The obligations of Purchaser to consummate the transaction contemplated by this Agreement are subject to the satisfaction of Purchaser at or prior to the Closing Date of each and every of the following conditions unless waived by Purchaser:

5.1 All of the representations, warranties and covenants of Seller contained in this Agreement shall be true and accurate as of the Closing Date.

5.2 Seller shall have performed or caused to be performed all obligations and agreements hereunder and complied or caused to be complied with all covenants and conditions contained in this Agreement to be performed or complied with by it at the Closing Date and all documents and items contemplated in this Agreement shall be delivered to Purchaser on the Closing Date including, without limitation, a Bill of Sale and Assignment and Assumption Agreement pertaining to the Stop & Shop Contract;

5.3 There will have been no material casualty, loss or damage to the Acquired Assets, whether or not covered by insurance;

5.4 All consents by third parties and/or governmental or quasi governmental entities that are required for the transfer, conveyance and/or assignment of the Acquired Assets to Purchaser and the payment of the Purchase Price to Seller, as contemplated herein, will have been obtained;

5.5 No action or proceeding before any court or governmental body will be pending against Seller which pertains to the Acquired Assets; and

5.6 Purchaser shall have received certified copies of the resolutions adopted by the Board of Directors of the Seller authorizing and approving the transactions contemplated in this Agreement and a Certificate of Legal Existence for Seller.

Should any and/or all of the foregoing covenants, conditions and/or contingencies, as set forth in this Section and/or elsewhere in this Agreement, not be met on or prior to the Closing Date, notwithstanding anything to the contrary contained herein, Purchaser reserves the right to terminate this Agreement, wherein all deposits and all interest therein shall be returned to Purchaser and this Agreement shall be null and void and of no further force and effect and the parties hereto shall have no rights and/or obligations against one another with respect to any matters arising out of this Agreement.

## SECTION VI. CONDITIONS TO SELLER'S OBLIGATIONS

The obligations of Seller to consummate the transaction contemplated by this Agreement are subject to the satisfaction of Seller at or prior to the Closing Date of each and every of the following conditions unless waived by Seller:

6.1   All of the representations, warranties and covenants of Purchaser contained in this Agreement shall be true and accurate as of the Closing Date.

6.2   Purchaser shall have performed or caused to be performed all obligations and agreements hereunder and complied or caused to be complied with all covenants and conditions contained in this Agreement to be performed or complied with by it at the Closing Date and all documents and items contemplated in this Agreement shall be delivered to Seller on the Closing Date.

6.3   All consents by third parties and/or governmental or quasi governmental entities that are required for the transfer, conveyance and/or assignment of the Acquired Assets to Purchaser and the payment of the Purchase Price to Seller, as contemplated herein, will have been obtained.

6.4   Seller shall have received certified copies of the resolutions adopted by the Board of Directors of the Purchaser authorizing and approving the transactions contemplated in this Agreement and a Certificate of Legal Existence for Purchaser.

6.5   Seller shall have received satisfactory evidence of Purchasers general liability insurance coverage with Seller named as additional insured through December 31, 2001.

## SECTION VII. RIGHTS AND OBLIGATIONS SUBSEQUENT TO CLOSING

7.1   *Survival of Representations and Warranties*. All representations, and warranties contained herein or in any Schedule, Exhibit, certificate or other document delivered by any party hereto to any other party hereto incident to the transactions contemplated hereby are material, shall be deemed to have been relied upon by such other party, shall survive the Closing Date for a period of one year, and shall not merge in the performance of any obligation by any party hereto.

7.2   *Indemnity*. Seller shall indemnify Purchaser against any claims pertaining to the Acquired Assets or the Stop & Shop Contract and arising prior to the Closing Date and Purchaser shall indemnify Seller against any and all of the same arising from and after the Closing Date.

In the event of any breach of any covenant, agreement, representation or warranty hereunder the non-breaching party shall be entitled to full indemnification from the breaching party (including but not limited to reasonable attorneys fees) plus interest at the rate of 12% per annum on any unpaid amounts due hereunder, provided that there shall be no liability for

attorneys fees if the breaching party shall acknowledge its indemnity obligation and shall defend against third party claims with counsel reasonably acceptable to the non-breaching party.

## SECTION VIII. UNFUNDED PENSION LIABILITY

The parties acknowledge that Seller currently has outstanding certain unfunded pension liabilities and the parties agree to allocate the liability for the unfunded pension liabilities as follows:

On and after April 1, 2003, Purchaser shall assume responsibility for 20% of Seller's unfunded pension liability on the Closing Date. On and after April 1, 2004, Purchaser shall assume an additional 20% of Seller's unfunded pension liability on the Closing Date, and on and after April 1, 2005, Purchaser shall assume all of Seller's unfunded pension liability on the Closing Date. Purchaser shall indemnify and hold harmless Seller against any failure to assume and pay any such unfunded pension liabilities.

## SECTION IX. MISCELLANEOUS

9.1   Governing Law. This Agreement shall be construed under and governed by the internal laws of the Commonwealth of Massachusetts without regard to its conflict of laws provisions.

9.2   Notices. Any notice, request, demand or other communication required or permitted under this Agreement shall be in writing and shall be deemed to have been given if delivered or sent by facsimile transmission, upon receipt, or if sent by registered or certified mail, upon the sooner of the date on which receipt is acknowledged or the expiration of three (3) days after deposit in United States post office facilities properly addressed with postage prepaid, or if sent by an overnight courier service, the next day. All such notices to a party will be sent to the addresses set forth below or to such other addresses or person as such party may designate by notice to each other party hereunder:

To Purchaser:    The Webster Corporation.
                 20 A Street
                 P.O. Box 388
                 Burlington, MA 01803
                 Attn: Thomas A. DiSilva

With a copy to:  John A. Zizza, Esq.
                 38 Church Street
                 Winchester, MA 01890

|   |   |
|---|---|
| <u>To Seller:</u> | John J. McCarthy, Jr.<br>c/o TransLease Group, Inc.<br>62 Everett Street<br>Westwood, MA 02090 |
| With a copy to: | C. Michael Malm, Esq.<br>Davis, Malm & D'Agostine, P.C.<br>One Boston Place, 37th Floor<br>Boston, Massachusetts 02108<br>Telephone: (617) 589-3803<br>Fax (617) 305-3103 |

Any notice given hereunder may be given on behalf of any party by its counsel or other authorized representatives.

9.3    <u>Entire Agreement</u>. This Agreement, including the Exhibits referred to herein and the other writings specifically identified herein or contemplated hereby, is complete, reflects the entire agreement of the parties with respect to its subject matter, and supersedes all previous written or oral negotiations, commitments and writings. No promises, representations, understandings, warranties and agreements have been made by any of the parties hereto except as referred to herein or in such Exhibits or in such other writings, and all inducements to the making of this Agreement relied upon by either party hereto have been expressed herein or in such Exhibits or in such other writings.

9.4    <u>Binding Effect</u>. This Agreement shall be binding upon and enforceable by, and shall inure to the benefit of, the parties hereto and their respective heirs, successors and permitted assigns.

9.5    <u>Captions and Gender</u>. The captions in this Agreement are for convenience only and shall not affect the construction or interpretation of any term or provision hereof. The use in this Agreement of the masculine or neuter pronoun in reference to a party hereto shall be deemed to include the masculine, feminine or neuter pronoun, as the context may require.

9.6    <u>Execution in Counterparts</u>. For the convenience of the parties hereto and to facilitate execution, this Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same document.

9.7    <u>Amendments</u>. Except as otherwise specifically provided herein, this Agreement may not be amended or modified, nor may compliance with any condition or covenant set forth herein be waived, except by a writing duly and validly executed by each party hereto, or in the case of a waiver, the party waiving compliance.

9.8 <u>Publicity and Disclosures</u>. No press release or public disclosure, either written or oral, of the transactions contemplated by this Agreement, shall be made by a party hereto without the prior knowledge and written consent of Purchaser and Seller.

9.9 <u>Consent to Jurisdiction</u>. Solely for the purpose of allowing a party hereto to enforce its indemnification and other rights hereunder, each of the parties hereby consents to personal jurisdiction, service of process and venue in the federal or state courts of the Commonwealth of Massachusetts.

9.10 <u>Enforcement of Agreement</u>. In the event that either party shall be required to commence legal proceedings to enforce this Agreement or any document executed in connection herewith, the prevailing party shall be entitled to reimbursement for its legal fees and expenses in addition to any damages and interest thereon at the rate of 15% per annum.

9.11 <u>Use of Seller's Corporate Names</u>. Immediately after the Closing, at the request of Purchaser Seller shall change its corporate name and shall authorize Purchaser to use Seller's prior corporate name or any name similar thereto.

9.12 <u>Leasing of Employees</u>. Seller and Purchaser agree that from the Closing Date through December 31, 2001, Seller will lease to Purchaser all of Seller's employees who are now working under the contracts being assigned under this Agreement to Purchaser. Purchaser will, in turn, lease those employees to the customer and will reimburse Seller upon presentation of billing for all compensation and benefits paid by Seller to such employees (including the reasonable expense to Seller of administrating such payroll), and Purchaser will indemnify and hold harmless Seller from and against any and all claims, losses or damages incurred by Seller as a result of Seller's continuing to employ of such employees from the Closing Date through December 31, 2001 (the "Interim Period"). As of January 1, 2002 all such employees shall become employees of Purchaser. During the Interim Period, Seller shall add Purchaser as an Alternative Employer under its workers compensation insurance policy and Purchaser shall name Seller as an additional insured on its general liability insurance policy.

9.13 <u>Employee Records</u>. Purchaser agrees not to destroy any of the employee records being transferred under this Agreement and Purchaser shall, upon reasonable advance notice and request, allow Seller to inspect and copy the same.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date set forth above by their duly authorized representatives.

PURCHASER:  THE WEBSTER CORPORATION

By: _____/s/ Thomas A. DiSilva_____
    Thomas A. DiSilva

SELLER:  THE 357 CORP.

By: _____/s/ John J. McCarthy, Jr._____
    John J. McCarthy, Jr., President

With respect to Section 1.4 only:

THE TRANS LEASE GROUP, INC.

By: _____
    John J. McCarthy, Jr., President

## EXHIBIT A

### ACQUIRED ASSETS

Stop & Shop Contract

Good Will

Employee Records

## EXHIBIT B

## THE STOP & SHOP CONTRACT

Agreement between The Delivery Corporation and The Stop & Shop Companies, Inc., dated May 23, 1980, as amended.

## EXHIBIT C

### EMPLOYEES TO BE HIRED BY PURCHASER

(Delivered Under Separate Cover)

# EXHIBIT D

## BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT