UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHARLES LANGONE, as FUND MANAGER of the NEW ENGLAND TEAMSTERS AND TRUCKING INDUSTRY PENSION FUND,<br><br>Plaintiff,<br><br>v.<br><br>THE 357 CORP.; THE TRANS-LEASE GROUP, INC.; FAIRLANE ACCEPTANCE COMPANY; WESTWOOD CARTAGE, INC.; LABOR PLUS, INC. aka THE TRANS-LEASE GROUP, INC.; ATLAS PERSONNEL, INC. aka THE TRANS-LEASE GROUP, INC.; ATLAS TRUCK LEASING, INC.<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>) C.A. No. 04cv11454 GAO<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**PLANTIFF'S REPLY TO WEBSTER CORPORATION'S OPPOSITION TO PLAINTIFF'S MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT**

### I.    Additional Facts.

The 357 Corp. and Atlas Personnel, Inc. ("Atlas"), contributing employers to the New England Teamsters and Trucking Industry Pension Fund ("the Fund"), withdrew from the Fund as a result of a sale of corporate assets, including certain employee leasing contracts, to The Webster Corporation ("Webster") in October 2001. As a result of the Asset Purchase Agreements, the employees of The 357 Corp. and Atlas performing work under the purchased leasing contracts were transferred to Manfi Leasing Corp., an entity under common control with Webster. Manfi, an employer obligated to make contributions to the Fund pursuant to collective bargaining agreements with Teamsters Local Union 25, began to contribute to the Fund for work performed under the leasing

contracts.  Such contributions have continued to date. As a result of the sale, The 357 Corp. and Atlas ceased operations and "withdrew from the Fund" as of December 2001.

On or about April 2002, Webster, The 357 Corp. and Atlas presented the Asset Purchase Agreements attached to the proposed Second Amended Complaint to the Fund with a request that the sale be found to comply with Section 4204 of ERISA.  In summary, Section 4204, cited in pertinent part in the Webster Memorandum (p. 7, Ln. 1) exempts a contributing employer from withdrawal liability when the employer withdraws as a result of an asset sale in an arms length transaction to an unrelated party and 1) the purchaser, bound by a collective bargaining agreement, agrees to contribute to the Fund substantially the same number of contribution base units contributed by the seller prior to the sale for a period of five plan years following the sale, 2) the purchaser provides the Fund with a bond calculated pursuant to Section 4204(a)(1)(B), and 3),  the seller agrees to be secondarily liable for the payment of its withdrawal liability if the purchaser withdraws from the Fund and fails to pay its liability.  If Section 4204 was found to apply, withdrawal liability would not be assessed against the withdrawn employers.

At a May 2002 meeting, the Fund Board of Trustees found that the Agreements, as written, did not comply with the statute.  The parties then executed a post sale amendment in an attempt to make the Asset Purchase Agreement compliant.  On or about February 28, 2003, the amended "4204 Agreement," attached hereto, was presented to the Fund.

The amended agreement was found to comply with Section 4204 with the exception that the seller, rather than the purchaser, was to provide the bond.  Upon review of the financial information of the seller's "control group," the Trustees of the Fund

indicated they were willing to accept a "purchaser's bond" provided by the seller in the amount of $2,697,337.00. However, the bond was never submitted to the Fund. Consequently, the Trustees found that The 357 and Atlas failed to comply with the provisions of Section 4204. A demand for payment of withdrawal liability was sent the these entities in May 2003. The 357 Corp., Atlas and a related control group corporation, Labor Leasing, Inc., have requested arbitration pursuant to the Multiemployer Pension Plan Amendment Act in January 2004. The arbitration is still pending. This instant action resulted from the failure of The 357 and Atlas to make interim payments of withdrawal liability pending the arbitration.

On July 20, 2005, the undersigned counsel for the Fund deposed Joseph Greenspan, C.P.A. in the arbitration case. John J. McCarthy, the president and principal shareholder of The 357 Corp. and Atlas, and signatory to the Asset Purchase Agreements attended along with his personal attorney. As a result of discussions with these individuals who had specific knowledge of the agreements, counsel for the Fund concluded that Webster was liable for payment of the withdrawal liability incurred by The 357 and Atlas under Section VIII of the purchase agreements. Section VIII in both Agreement states:

> "On and after April 1, 2003, Purchaser shall assume responsibility for 20% of Seller's unfunded pension liability on the Closing Date. On and after April 1, 2004, Purchaser shall assume an additional 20% of the Seller's unfunded pension liability on the Closing Date, and on and after April 1, 2005, Purchaser shall assume all of Seller's unfunded pension liability on the Closing Date. Purchaser shall indemnify and hold harmless Seller against any failure to assume and pay any such unfunded pension liabilities."

Webster had not paid the unfunded liability as stated under the Agreements to either Atlas or The 357 Corp. Further, Counsel for the Fund was provided with financial data

relevant to the withdrawing entities and Trans-Lease Corp., a defendant and parent corporation for numerous currently operating control group entities. Counsel was further informed that the control group assets were insufficient to satisfy the Fund's withdrawal liability assessment. Consequently, Webster's failure to pay pursuant to the assumption and indemnification section of the Asset Purchase Agreements will adversely affect the Fund.

II.    **The Court Does Not Lack Jurisdiction of the Fund's Claim against The Webster Corporation.**

The Fund first and foremost, asserts that the Court has original jurisdiction over its claim against Webster pursuant to a federal cause of action under Section 4301, the Enforcement provision of the Multiemployer Pension Plan Amendment Act. (Paragraph 2 of the Proposed Second Amended Complaint.) Section 4301(a)(1) states, "A plan fiduciary, employer, plan participant, or beneficiary, who is adversely affected by the act or omission of any party under this subtitle with respect to a multiemployer plan, ... may bring an action for appropriate legal or equitable relief, or both."

In this case, The 357 Corp. and Atlas, two contributing employers to the Fund, ceased operations as a result of the sale of certain assets to Webster. The consideration for such sale included not only the purchase price but also a promise by Webster to "indemnify and hold harmless Seller against any failure to assume and pay any such unfunded pension liabilities." Withdrawal liability has now been assessed and "the Seller," i.e. The 357 Corp. and Atlas and its control group entities have indicated to Fund Counsel that they lack the assets to pay the withdrawal liability. In fact, as specifically stated in Defendant The 357 Corp.'s Answer, an order of payment in would cause "irreparable harm" such that "The Defendant would have no choice but to seek the

protection of the Bankruptcy Court should an interim payment order issue." (Defendant's Answer, p. 4). The failure of Webster to "make good" on its promise may well prevent the Fund from collecting the withdrawal liability assessment and so will certainly adversely effects the Fund as contemplated by Section 4301.

In its Complaint, the Fund has stated that it seeks jurisdiction against Webster pursuant to 28 U.S.C. §1367 in the alternative, and begs to differ with Webster that the claim does not arise from a "common nucleus of operative facts." Withdrawal liability occurred as a result of the Asset Purchase Agreements between The 357 Corp., Atlas and Webster. In its answer, Defendant states as a defense that liability should not be assessed because Fund was not harmed by the asset sale. It claims Webster[1], the purchaser, is a financially viable operation, which will continue to contribute to the Fund. It asserts that the asset sale was a merger or consolidation rather than an asset sale. (Answer p. 3). Although the Fund does not concede that any of these defenses are viable, the issues, witnesses and evidence relating to these defenses concern the interpretation and consequences of the Asset Sale agreements and overlap with the issues, witnesses and evidence relating to the claim against Webster.

More importantly, the Defendant's claim of "irreparable harm" is the one defense to an action for interim withdrawal liability payments that has been recognized by the First Circuit as potentially viable defense. The Court of Appeals addressed "irreparable harm" in *Giroux Bros. Transportation v. New England Teamsters and Trucking Industry Pension Fund*, 73 F.3d 1, 5 n4 as follows:

> Although we have therefore held that "assessed interim liability payment must be paid . . . notwithstanding a pending arbitrable dispute," Debreceni,

---

[1] Defendant describes Webster and Manfi Leasing as the DaSilva Group, presumably because ownership of Webster and its control group entities is held by members of the DiSilva family.

889 F.2d at 4, we have never squarely decided whether an equitable exception exists. n6 *Id.* at 7. However, in light of the clear congressional intent to protect multi-employer pension plans in withdrawal liability disputes, we have indicated that should an equitable exception exist it would "require no less than the threat of imminent insolvency." *Id.* at 7 and n.6. Giroux's allegations, even if accepted, do not suggest such harm.

If in fact, Webster has an obligation under the Asset Purchase Agreement to pay the withdrawal liability, the Defendant's claim that a judgment would cause "irreparable harm" would be invalidated. The Webster claim is therefore "part of the same case and controversy."

Finally, 28 U.S.C. 1367(c) states:

The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—
  (1) the claim raises a novel or complex issue of State law,
  (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
  (3) the district court has dismissed all claims over which it has original jurisdiction, or
  (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

The third party beneficiary claim is a straight forward contract claim raising no novel or complex issues. It clearly relates to defenses raised in the Answer and as such does not "predominate" over the withdrawal liability claim. The underlying ERISA claim has not been dismissed and there are no other exceptional circumstances pertaining to this claim that would justify overriding the clear intent of the statute that leave to amend be "freely given." Fed. R. Civ. P. 15 (a).

### III.    The Fund's Claim Against Webster is Not Preempted by ERISA.

As previously stated, jurisdictional authority for the Fund's claim is first and foremost based upon ERISA Section 4301, and is therefore not preempted. Second, assuming *arguendo* that the Fund's claim is found in the alternative to be based upon

auxiliary jurisdiction, the stated third party beneficiary claim is not preempted under current holdings of the First Circuit Court of Appeals.  In 2000, the First Circuit revisited the issue of preemption of state law claims by ERISA Funds in *Carpenters Local Union No. 26, United Brotherhood Of Carpenters & Joiners Of America, et a.  v. United States Fidelity & Guaranty Company,* 215 F.3d 136 (1st Cir. 2000) in light of then recent decisions by the United States Supreme Court, specifically *New York State Conf. Of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654, 131 L. Ed. 2d 695, 115 S. Ct. 1671 (1995); and *De Buono V. NYSA-ILA Med. & Clin. Servs. Fund*, 520 U.S. 806, 813, 138 L. Ed. 2d 21, 117 S. Ct. 1747 (1997).  As a result, it reversed its earlier decisions that and found a state law bond claim by an ERISA benefit fund to collect delinquent contributions was no longer preempted. *Carpenters,* 215 F.2d at 142.

The First Circuit acknowledged the earlier preemption cases cited by Webster in its brief at p. 6, but concluded,

> As time passed, it [the Supreme Court] grew more guarded, emphasizing the "starting presumption that Congress does not intend to supplant state law," [*citing Travelers and De Buono]* and warning that, unless congressional intent to preempt clearly appears, ERISA will not be deemed to supplant state law in areas traditionally regulated by the states, see *Dillingham*, 519 U.S. at 325; *Travelers*, 514 U.S. at 655.  *Id.*  at 139-140.

Consequently, the Court has developed a three part preemption test including "connection with", a "reference to" and an "alternative enforcement mechanism" prongs. *Pharmaceutical Care Management Association v. G. Steven Rowe*, 429 F.3d 294, 2005 U.S. App. LEXIS 24032 (1st Cir. 2005); *Carpenters Local Union No. 26*, 215 F.3d at 140.

ERISA expressly preempts "any and all State laws insofar as they . . . relate to any employee benefit plan."  29 U.S.C. § 1144(a) (2000).  A state law relates to an employee

benefit plan if it has a "connection with" or a "reference to" such plan.  *Pharmaceutical Care,* 429 F.3d at 296.  The "connection" prong calls for an examination of whether the state law interferes with the ERISA goal of establishing a uniform administration of employee benefit plans unimpeded by a multiplicity of state regulation.  The instant state law claim, allowing a benefit fund to collect a debt as a third party beneficiary, neither regulates nor subjects a benefit plan to conflicting requirements.  It does not, therefore, connect to the administration of ERISA benefit plans.  With respect to the "refer to" prong, a third party beneficiary claim is based upon Massachusetts state law governing all contracts subject to state law and does not reference benefit plans.

Finally, a state law which allows for an alternative enforcement mechanism that "purposes to provide a remedy for violation of a right expressly guaranteed and exclusively enforced by the ERISA statute" may be preempted.  However, ERISA does not preempt state laws that "touch upon enforcement but have no real bearing on the intricate web of relationships among the principal players in the ERISA scenario (e.g., the plan, the administrators, the fiduciaries, the beneficiaries, and the employers)." *Carpenters Local Union No. 26*, 215 F.3d at 141-2.

The purported state law claim of the Fund has no such bearing.  The Multiemployer Pension Plan Amendment Act (MPPAA) sets forth a dispute resolution mechanism for the establishment and collection of withdrawal liability claims from a statutorily defined "employer."  Allowing the Fund to collect the assessment, once established, from a third party who is liable under state law for the employer's debt does not interfere with this enforcement mechanism.  Quite the contrary, similar to the bond claim by a benefit plan for delinquent contributions against a surety, the third party

beneficiary claim simply, "regulates an area of the law traditionally thought to be the states' preserve: enforcing contracts under state law for the citizenry's protection. *Id*.

Courts have routinely found that state law claims to collect a withdrawal liability debts owed to an ERISA benefit plans are not preempted.  For example, in *Central States, Southeast and Southwest Areas Pension Fund v. Howard*, 254 F. Supp. 2d, 1069, 1071-1072  (N.D.Ill. 2003), a state common law fraudulent conveyance claim for collection on unpaid withdrawal liability was not preempted as it did not affect liability under ERISA, "rather, they [such claims] are debtor-creditor laws of general applicability which help fill the gap in ERISA's provisions." *Id*. at 1072.

Although Webster concedes that the purpose of ERISA Section 4204 is to "protect a pension plan" (Webster Memorandum, p. 7), it proceeds to interpret the statute in such a manner as to belie this purpose.  Webster, The 357 Corp. and Atlas failed in their attempt to exempt the latter two corporations from withdrawal liability pursuant to Section 4204 because the statutory bond was not posted.  Thus, the transaction does not fall within the purview of this provision.  Webster is correct that usually in such cases, the seller, not the purchaser, is liable for withdrawal liability.  However, here, there is a special circumstance, the purchaser, as part of the consideration given in purchasing the seller's assets, also agreed to assume the withdrawal liability and indemnify the seller. This provides the Fund with two potential sources of recovery of the withdrawal liability assessment – the seller and the purchaser.  Certainly, ERISA would not prohibit the parties from negotiating an agreement that provides additional benefits to a pension fund than what is provided by the statute.  To find such a prohibition would inhibit rather than promote the purpose of the statute.

9

**IV.    Whether Plaintiff's Third Party Beneficiary Claim is Meritorious is a Question of Fact Not Properly Addressed By This Motion.**

Webster argues that Plaintiff cannot amend his complaint to add Webster as a defendant under a third party beneficiary claim because the claim is not meritorious under Massachusetts law.  (Webster Memorandum, p. 9).  However, the motion before this court is made pursuant to Federal Rule of Civil Procedure 15(a).  The standard for granting or denying such motion is set forth by the Supreme Court:

> In the absence of any apparent or declared reason – such as delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, etc. – the leave should, as rules require, be "freely given."  *Foman v. Davis,* 371 U.S. 178 (1962).

Webster has improperly attempted bootstrap a Motion to Dismiss the claim pursuant to Fed. R. Civ. P. 12(b).  (Webster Memorandum, p. 3, 11).  It fails to mention that, in a 12(b) motion, all factual allegations in the plaintiff's complaint must be taken as true. *See, e.g., Gavrilles v. O'Connor,* 579 F. Supp. 301, 303 (D. Mass. 1984).  To grant such a motion to dismiss, it must appear beyond doubt that the plaintiff can prove no set of facts in support of that claim which would entitle the plaintiff to relief.  *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S. Ct. 99, 102, 2 L. Ed. 2d 80 (1957).    Under this standard, the Fund's claim must stand.

The Complaint alleges that the Fund is an intended beneficiary in paragraph 78.  This fact must be assumed true. The "facts and circumstances" of the agreement do not justify denial of the amended complaint.  Webster's argument that the "unfunded pension liability" in the Agreements did not refer to the Fund is disingenuous.  (Webster Memorandum, p. 9).  The sellers had withdrawal liability with only one Fund.  The Asset

Purchase Agreements were presented to the Fund with a request for an exemption from withdrawal liability under Section 4204. (*Supra*, p. 2). The 4204 Agreement attached hereto specifically mentions the Fund. In addition, withdrawal liability is calculated as of December 2001, the date The 357 Corp. and Atlas permanently ceased contributions to the Fund. Liability was not assessed until May of 2003 when the Fund determined that the agreements did not comply with Section 4204. It is reasonable to interpret the assumption provision of the contract was intended to set the amount of the withdrawal as of the closing date but the assumption date as of April 2003, etc. Without conceding that Webster's opposition can be converted a Motion to Dismiss under Rule 12(b), using the proper standard under this rule, the Fund's claim must survive.

### V.    Plaintiff's Motion to Add Webster Was not Inexcusably Delayed.

The scheduling conference in this case took place on December 21, 2004. Plaintiff indicated that the named Defendant, The 357 Corp., had ceased operations. As a result, the identification of all currently operating control group entities jointly and severally liable for the withdrawal liability assessment was imperative in order for the Fund to successfully obtain and collect upon a judgment in this matter. Disclosure had been requested by the Fund on July 7, 2003 pursuant to ERISA Section 4219(a). When Defendant refused to identify the entities, Plaintiff requested disclosure in Count II of the original complaint. The Scheduling Order instructed Plaintiff to file a Motion for Partial Summary Judgment on Count II. No discovery schedule was set in place. The Motion was filed on January 14, 2005. Pending a decision, Plaintiff filed a First Amended Complaint including six entities it determined were under common control with Defendant based on information obtained in the pending arbitration. (AAA 11 621 0021

04).  An Order was issued granting the Partial Summary Judgment Motion on September 16, 2005.  The identification of the control group entities was sent to Fund Counsel some time after October 17, 2005.  At a Status Conference scheduled on November 7, 2005, Plaintiff indicated that the Complaint would be amended to include four newly identified control group entities as well as Webster Corporation.  The Motion to File a Second Amended Complaint was filed on November 28, 2005.

The delays in this case are unusual but not inexcusable, and due primarily to the Defendant's unwillingness to disclose all other potential co-defendants.  In fact, the information obtained by Plaintiff in order to file a claim against Webster was gleaned during a deposition in the arbitration. (*Supra* p. 3).  As a discovery schedule has not been set, there is no prejudice to Webster as a result of the delay.  One would assume that Webster would prefer to participate in the litigation if it may ultimately be found liable for payment of the underlying obligation.

## V.    Conclusion.

For the foregoing reasons, Plaintiff respectfully requests that its Motion to File the Second Amended Complaint be allowed forthwith against all defendants, including The Webster Corporation.

Dated: January 6, 2006                    Respectfully submitted,

                                          For the Plaintiff,
                                          CHARLES LANGONE, FUND MANAGER,
                                          By his Attorney,

                                          /S/ Catherine M. Campbell
                                          Catherine M. Campbell
                                          BBO #549397
                                          Feinberg, Campbell & Zack, P.C.
                                          177 Milk Street
                                          Boston, MA   02109
                                          (617) 338-1976

                                          Certificate of Service

    I, Catherine M. Campbell, hereby certify that I caused a copy of the foregoing to be mailed on this day by U.S. first-class mail to Geoffrey P. Wermuth, Esq., Murphy, Hesse, Toomey & Lehane, LLP, World Trade Center East, Two Seaport Lane, Boston, MA 02210, John McCarthy, President of National Traffic Systems, Inc., McCarthy Industries, Inc., Archon Co., Inc., and Warehouse Transport, Inc., 62 Everett Street, Westwood, MA 02090 and Neil Jacobs, Esq. Wilmer Cutler Pickering Hale & Dorr LLP, 60 State Street, Boston, MA 02109.

                                          /S/ Catherine M. Campbell
                                          Catherine M. Campbell

Date: January 6, 2006